STATE OF MAINE                                    SUPERIOR COURT
SOMERSET, SS.                                     CIVIL ACTION
                                                  DOCKET NO.:  SOMSC-CV-23-

---

DAVID ALAN COLE & KIMBERLY COLE,

       Plaintiffs

v.                                                **COMPLAINT**

SIG SAUER, INC.,

       Defendant.

---

      Plaintiffs, David Alan Cole and Kimberly Cole, by and through their counsel, hereby state

the following Complaint in Civil Action against the above-captioned Defendant, and in support

thereof, aver as follows:

## PARTIES

      1.     Plaintiff David Alan Cole (*hereinafter* "D. Cole") is an adult male. His date of birth

is May 13, 1983.

      2.     Plaintiff D. Cole is a resident of the Town of Norridgewock, County of Somerset,

State of Maine.

      3.     Plaintiff D. Cole is employed as a detective at the Somerset County Sheriff's

Department and was trained and proficient in pertinent firearm safety at all relevant times.

      4.     Plaintiff Kimberly Cole (*hereinafter* "K. Cole") is an adult female. Her date of birth

is November 28, 1971.

      5.     Plaintiff K. Cole is a resident of the Town of Norridgewock, County of Somerset,

State of Maine.

1

6.      Plaintiffs D. Cole and K. Cole are—and were at all times relevant to this Complaint—legally married spouses under Maine law.

7.      Defendant, Sig Sauer, Inc. (*hereinafter* "Sig Sauer") is a corporation or other business entity with its principal place of business at 72 Pease Boulevard in Newington, New Hampshire, 03801, and organized and incorporated under the laws of Delaware.

8.      The Clerk/Registered Agent listed for Defendant on the Maine Department of the Secretary of State Bureau of Corporations, Elections & Commissions Interactive Corporate Services' Corporate Name Search Database in Cogency Global, Inc.

9.      Cogency Global, Inc.'s listed contact information is: 75 York Street, Suite 2, Portland, Maine, 04101.

10.     Defendant's charter number, as assigned by the Maine Bureau of Corporations, Elections & Commissions is 20090841 F.

11.     Defendant's status is presently listed as in "good standing" with the Maine Bureau of Corporations, Elections & Commissions.

12.     At all relevant times, Defendant purposefully established significant contacts in Maine, and has carried out—and continues to carry out—substantial, continuous, and systematic business activities in Maine, specifically in Somerset County.

13.     At all times relevant to this Complaint, Defendant was acting by and through its employees, servants, and agents within the course and scope of their employment, service and agency.

2

## GENERAL ALLEGATIONS

14.     Defendant designs and manufactures firearms for sale to military and commercial markets throughout the United States and internationally. It markets and sells its products directly and through dealers.

15.     Sig Sauer was formerly known as "SIG SAUERARMS Inc.," and changed its name to "Sig Sauer, Inc.." in October 2007. Defendant's President and Chief Executive Officer was, at all times relevant to this Complaint, Ronald J. Cohen.

16.     This matter involves a striker-fired pistol known as the model "P320."

17.     The Sig Sauer P320 is a firearm susceptible to unintended discharges—meaning instances when a gun fires without the trigger being pulled or deliberately actuated by the user.

18.     There have been over 120 other similar incidents ("OSI") of the Sig Sauer model P320 unintentionally discharging on numerous civilians and law enforcement agents across the nation when the user believed they did not pull the trigger, resulting in severe injury to the users and/or bystanders.

19.     Defendant marketed most model P320s to law enforcement officers and military personnel, and as such, the vast majority of model P320 users are law enforcement officers, and current and former military personnel.

20.     This action seeks actual, compensatory, and enhanced compensatory damages, as well as equitable relief relating to Defendant's negligence, strict products liability, fraudulent concealment, negligent failure to warn, defective design, breach of the implied warranty of merchantability, loss of consortium, and punitive damages all relating to Plaintiff D. Cole's severe and permanent personal injuries caused by Defendant's actions and/or omissions as detailed *infra*.

21.    Prior to the incidents detailed in this Complaint, Sig Sauer received multiple complaints and notifications of other similar incidents ("OSIs") of model P320 pistols firing when the trigger was either not pulled, or not deliberately actuated by the user.

22.    Defendant promised in its advertisements that the P320 was equipped with every necessary feature to prevent the P320 from firing when the user did not want it to:



# SAFETY WITHOUT COMPROMISE

We've designed safety elements into every necessary feature on this pistol. From the trigger, to the striker and even the magazine, the P320 won't fire unless you want it to.

*Sig Sauer Advertisement for the P320.*

23.    Despite this express representation, which Defendant Sig Sauer has made for the last several years to the present, the model P320 lacks industry-standard safety features and fires without the user deliberately pulling the trigger.

24.    The model P320 is the first "striker-fired pistol" that Defendant manufactured.

25.    A striker-fired pistol is different from the traditional "hammer-fired" pistol.  It contains no external hammer to be pulled back by the user; rather, it has an internal "striker" that is held back under spring pressure inside the gun, like a bow and arrow. The P320 is designed so that the rearward movement of the slide places the striker under significant spring tension, making it ready to fire once it is released. The striker is held back by the weapon's sear.  In the below illustrative photo of a typical striker-fired pistol, the striker, in red, is held back by the sear, in blue.

4



*Sig Sauer P320.*

26.     Defendant had knowledge long before the sales of the subject P320 used by Plaintiff that the model P320 was capable of firing unintentionally due to defective components and/or the lack of necessary safety features, including but not limited to: a manual safety, a tabbed trigger safety, a de-cocker, a hinged trigger, and/or a grip safety.

27.     For many years since the weapon was first introduced to the market in 2014, Defendant has recklessly and wantonly failed to recall the model P320 despite having knowledge of scores of grievous wounds inflicted upon users and bystanders in OSIs.

28.     Years before the incident occurred—through and including the date of Plaintiffs' incident—which span from February 15, 2020 to October 3, 2022, Defendant expressly represented that the weapon could not fire without a trigger pull: "[w]e've designed safety elements into every necessary feature on this pistol.  From the trigger, to the striker and even the magazine, the P320 won't fire unless you want it to":



*Sig Sauer Advertisement for the P320.*

29.     In additional marketing material, under the heading "Striker Safety," Defendant further states: the striker safety "[p]revents the striker from being released unless the trigger is pulled."

30.     At the same time, Defendant contradictorily stated in the original owner's manual for the model P320, which warns on page 25, that the weapon could fire if dropped without the trigger being pulled if a round were "chambered," i.e., inside the firing chamber of the weapon's slide.

31.     It is standard operating procedure for many U.S. law enforcement agencies, local police departments, and the military, to carry pistols with a chambered round at a commander's discretion. This is similarly customary for many private owners.

32.     Sig Sauer advertises that users can carry the model P320 with a round chambered by annotating the P320's capacity in various configurations as "10 + 1," "12 + 1," etc.

33.     The "+ 1" represents a chambered round.

34.     Sig Sauer was aware of the latter fact at the time it designed and manufactured all its pistols, including the model P320.

35.     Sig Sauer assembled the model P320 using the same frame from an earlier hammer-fired Sig Sauer model, the P250.

36.     While competing for a $580 million contract to supply the United States Army with a new service pistol in 2016, Defendant's prototype for the model P320 registered nearly 200 malfunctions during U.S. Army testing.  The U.S. Army demanded that Sig Sauer fix all problems associated with the prototype.

37.     The Unites States Army only agreed to the purchase of the model P320 after Sig Sauer committed to designing an external manual safety for every military gun sold.

38.     Of the nearly 20 sub-models of non-military P320s, only one sub-model offers a manual external safety as an "option."

39.     Sig Sauer's custom-design program allows for hundreds of thousands of different configurations of the model P320, but does not allow users to add any type of external safety.

40.     An external manual safety, at the time the subject gun was sold, was certainly technologically feasible for the model P320.

41.     A properly functioning and active external manual safety, at the time the subject gun was sold, would preclude a properly functioning model P320 from firing in an unintended fashion.

42.     Upon information and belief, every striker-fired pistol on the market is equipped with some type of manual safety, whether it is a thumb safety, tab trigger safety, grip safety, de-cocker, or hinge trigger.

43.     Upon information and belief, Defendant manufactures the only striker-fired pistols on the market that are not equipped with any form of external manual safety.

44.     Upon information and belief, every single-action pistol on the market is equipped with some type of manual safety, whether it is a thumb safety, tab trigger safety, grip safety, decocker, or hinge trigger.

45.     Upon information and belief, Sig Sauer manufactures the only single-action pistols on the market that are not equipped with any form of external manual safety.

46.     Sometime after January 2017, when a Connecticut law enforcement agent was shot by a model P320 that fell to the ground from less than three feet, Defendant removed the warning on page 25 from the user manual regarding a chambered round, and replaced it with the following language:



All SIG SAUER pistols incorporate effective mechanical safeties to ensure they only fire when the trigger is pressed. However, like any mechanical device, exposure to acute conditions (e.g. shock, vibration, heavy or repeated drops) may have a negative effect on these safety mechanisms and cause them to fail to work as designed. After suspected exposure to these conditions, have the firearm checked by a certified armorer before using. Mechanical safeties are designed to augment, and not replace safe handling practices.**Careless and improper handling of any firearm can result in unintentional discharge.**

(emphasis in original).

47.     Defendant had never before represented that mere "vibration" could cause the weapon to discharge.

48.     Upon information and belief, no other firearms manufacturer has ever made such a representation.

49.     Sig Sauer acknowledges in its own manuals that vibrations can cause its safety mechanisms to fail to work as designed.

8

50.     Since the model P320's manufacture and distribution into the stream of commerce, Sig Sauer has expressly represented that the weapon possessed a "robust safety system":



*Sig Sauer Advertisement for the P320*

51.     Despite their representations, Sig Sauer never made a "tabbed trigger safety" available as an option for the model P320.[1]

52.     In fact, Defendant's original design and manufacture of the model P320 rendered the weapon unreasonably dangerous for its intended uses and for any foreseeable uses, including normal carrying, holstering, un-holstering, and/or handling.

53.     When Defendant shipped model P320s to dealers for sale to civilian consumers, Defendant knew or should have known that the weapon was defective in its design and unreasonably dangerous for its ordinary uses, intended uses, and all other foreseeable uses and that unintended discharges could occur in the ordinary course of using the weapon.

---

[1] A tabbed-trigger safety is a small tab within the trigger which must be depressed in order for the entire trigger to be depressed; thus preventing unintended discharges.

54.     Before Plaintiff D. Cole's employer purchased the subject P320, Sig Sauer was aware of other, prior unintentional discharges of the model P320, and other Sig Sauer pistols, many of which pre-dated said purchase.

55.     In February 2016, a fully-holstered model P320 discharged without a trigger pull inside a Roscommon, Michigan Police Officer's vehicle when the officer moved to exit the vehicle during a snowstorm.   The incident was captured on the Officer's body-worn camera.

56.     In 2016, the Surprise, Arizona Police Department complained to Sig Sauer of two separate incidents of P320s unintentionally firing.

57.     In October 2016, a P320 unintentionally fired on retired NYPD Officer Thomas Frankenberry in South Carolina, severely injuring him. The spent casing did not eject.

58.     In November 2016, a P320 unintentionally fired on an Officer in Holmes Beach Florida, striking him in his leg.

59.     In 2017, a Sheriff's Deputy in Michigan's Sig Sauer pistol unintentionally fired, striking a schoolteacher in the neck.

60.     On January 5, 2017, a P320 unintentionally shot a Stamford, Connecticut SWAT team member in his left knee when the pistol fell from a distance of less than three feet to the ground while fully holstered, refuting SIG SAUER's express representations that the weapon is drop safe, cannot fire without a trigger pull and does not require a safety to be drop safe.

61.     On February 28, 2017, a P320 unintentionally discharged while being carried by an officer of the University of Cincinnati Police Department.

62.     On June 14, 2017, a P320 unintentionally discharged in Wilsonville, Oregon.

63.     On June 20, 2017, a P320 unintentionally discharged while in use by an officer of the Howell Township, New Jersey Police Department.

64.     In June of 2017, Sig Sauer shipped approximately 800 P320s to the Loudoun County, VA Sheriff's Department, privately assuring its leadership, Sheriff David Chapman that the problems with the weapon would be fixed, but that for the time being it had to deal with the weapon as currently manufactured and designed.[2]

65.     On July 28, 2017, a P320 unintentionally discharged in Tarrant County, Texas.

66.     On August 4, 2017, a Stamford, CT SWAT team member sued Sig Sauer in U.S. District Court in Connecticut for an unintentional discharge of a commercial version of the P320 that shot him in his knee.

67.     Four days later, Sig Sauer released a statement stating: "there have been zero (0) reported drop-related P320 incidents in the U.S. Commercial market." SIG SAUER, INC., SIG SAUER REAFFIRMS SAFETY OF P320 PISTOL (2017), https://firelancemedia.com/sig-releases-statement-p320-safety-issues/.

68.     This statement was false, in view of Sig Sauer's knowledge that Officer Sherperis in Connecticut had been shot by a drop fire some eight months earlier with the commercial version of the P320, and that several other unintentional discharges of the P320 had occurred before that date.

69.     On August 8, 2017, Sig Sauer announced a "voluntary upgrade" program for the model P320 pistol, stating that the pistol meets "rigorous testing protocols for global military and law enforcement agencies" and all "U.S. standards for safety."

70.     This statement was also false, as there are no federal government standards for gun safety—a fact known to Defendant when it issued this press release.

---

[2]     As noted *infra*, both a non-upgraded and "upgraded" version of these P320s later unintentionally fired and hit at least two Loudoun County deputy sheriffs in 2018 and 2019.

71.     No federal agency oversees how firearms are designed or built. Firearms were expressly exempted by Congress from any federal regulation when it created the Consumer Product Safety Commission in 1972.

72.     Sig Sauer's "upgrade" program, which was presented to the public as purely optional, not urgent, and not mandatory, offered to mark existing commercial versions of the P320 "better" by installing a much lighter trigger, and internal disconnect switch, an improved sear to prevent unintentional discharges.

73.     On August 9, 2017, the Police Chief of Morrow, Georgia issued an emergency order removing the P320 from service in its agency.

74.     In October 2017, a P320 unintentionally discharged in Georgia when an officer fell to the ground in pursuit of a suspect. His weapon was holstered and fired simply when he struck the ground.

75.     On November 12, 2017, a P320 unintentionally discharged in Dallas County, Texas.

76.     On February 2, 2018, Tyler Herman of McCloud, Oklahoma was removing a holster containing his P320 from his belt. While in the process of removing the holster, and without him touching the trigger, Herman's P320 unintentionally discharged, striking Herman and causing catastrophic injuries.

77.     On February 7, 2018, Loudoun County, Virginia Deputy Sheriff Marcie Vadnais's P320 unintentionally fired on her, severing her right femur causing catastrophic skeletal injury, deformity, three general anesthesia surgeries, severe emotional distress, and related trauma, ending her career. Upon CT-scanning her P320, it was found to have both a design and

manufacturing defect: crossed sear springs that apply upward spring pressure to the sear to keep it from releasing the striker.

78.      Months later in April 2018, Sig Sauer issued a second "voluntary upgrade" notice to all users or owners of the P320, but still did not recall the weapon.

79.      In May 2018, civilian Gunter Walker reported to Sig Sauer that his P320 unintentionally fired on him when he placed the weapon down on his nightstand, shooting him through the palm of his left hand.

80.      In June 2018, a Williams County, Ohio Officer reported that his P320 unintentionally discharged twice, rapidly as he was merely attempting to move the slide backward. One round grazed the Officer's arm; the other blew through his patrol car's driver's side door.

81.      In May 2018, a Rancho Cucamonga, California Officer reported that his P320 unintentionally fired while he was walking inside his department locker room.

82.      In October 2018, a P320 unintentionally fired on Lieutenant Letrell Hayes in Georgia while he was holstering it, causing severe tunneling injuries to his right thigh and calf.

83.      In October 2018, retired Law Enforcement Officer Stephen Mayes' P320 unintentionally fired while seated in its holster, causing severe injury to his right leg.

84.      In December 2018, civilian Robert Lang's P320 unintentionally fired on him causing serve tunneling wounds to this right leg.

85.      On May 19, 2019, the P320 of Lieutenant Thomas Ahern of the Cambridge, Massachusetts SWAT team unintentionally fired inside a SWAT van with six other occupants while he was working a shift for the annual MayFair event near Harvard Square.

86.     The round struck a cellphone case on Ahern's left leg, deflected into a SWAT gear bag and came to rest in a ballistic helmet, narrowly missing everyone else in the van. The casing of the round did not eject. Lieutenant Ahern is a Sig Sauer certified armorer[3] on the P320.

87.     On July 23, 2019, a P320 unintentionally fired on Officer Walter Collete, Jr. of the Somerville, Massachusetts Police Department hitting him in his leg and causing substantial injuries to his leg.

88.     In August 2019, a Philadelphia Transit Officer Craig Jacklyn's P320 unintentionally fired while fully-holstered, nearly striking a bystander in the subway concourse. The incident was captured on video.

89.     The transit authority replaced all Sig Sauer P320s, and later fully exonerated the officer of any alleged wrongdoing in view of the content of the videotape of the incident showing that it unintentionally fired. The officer, Craig Jacklyn, later stated:

> This weapon is a hazard. I actually spoke with a lawyer for my situation. Although no one was hurt...someone could have been killed. I'm angry that I was put in a potentially life altering position with a product deemed "safe" by its manufacturer. The fact that officers are carrying this weapon on the job and at home around family thinking it's safe even while resting in its holster has me very angry. Everything that I've told you is documented through 2 Investigative Services. Philadelphia Police Firearms Investigative Unit/ Officer Involved Shooting Incident Unit and SEPTA Transit Police Criminal Investigations Unit. There is station video footage/ body worn camera footage as well.

---

[3] According to Sig Sauer documents, "[t]he SIG SAUER factory armorer certification enables the agency armorer or individual user to completely disassemble, inspect, service, and re-assemble associated weapon systems without voiding the factory warranty. Proper and routine weapon maintenance and inspection of a firearm are essential to ensure maximum reliability. Factory armorer courses at SIG SAUER Academy certify agency armorers or individuals to maintain, inspect, service, and repair selected SIG SAUER firearms while preserving the factory warranty. Upon successful completion, armorers will fully understand each firearm and be factory-certified for a period of three years." https://www.Sig Sauersaueracademy.com/course/armorer-certification

90.     On September 3, 2019, another P320 in use by the Loudoun County, Virginia's Sheriff's Office unintentionally fired on another Loudoun County Deputy Sheriff, Carl Costello, hitting his leg.

91.     On October 10, 2019, Officer Jacques Desrosiers, also of the Cambridge, Massachusetts Police Department, was shot by his P320 unintentionally without him pulling the trigger. The round caused massive and life-changing injuries to Officer Desrosiers. The spent casing of the round did not eject.

92.     On October 11, 2019, a P320 unintentionally fired on Veterans Affairs Police Officer Frank J. Kneski, striking him beneath his lower back as he was un-holstering the weapon. Upon inspection it was found that the spent casing did not eject.

93.     On November 9, 2019, a P320 unintentionally fired on Officer Matthew Gardette of the Manteca, California Police Department as he was getting ready for work. As he merely attempted to place and fasten his duty belt around his waist, the P320 unintentionally discharged inside the holster.

94.     The holster was a Safariland level three retention holster with a hood securing the pistol. The round blew out the bottom of the holster, impacted the locker room floor, and missed both Officer Gardette and fellow officers by inches as it ricocheted into a locker door.

95.     On December 2, 2019, a P320 unintentionally fired while in the possession of Detective David Albert, also of the Cambridge, Massachusetts Police Department, as he was in the process of putting his duty belt on.

96.     Upon information and belief, employees at Sig Sauer's own training academy in New Hampshire have admitted to unintentionally discharges causing injury in both 2016 and 2017.

97.     On February 15, 2020, Pasco County Florida Sheriff's Deputy David Duff was injured when his P320 unintentionally discharged without him pulling the trigger while the gun was in its holster on his duty belt.

98.     On February 27, 2020, Tampa Police Department Reserve Office Howard Northrop was severely and permanently injured when his service-issued P320 unintentionally discharged without a trigger pull, while inside his service-issued holster.

99.     Northrop was struck in the left leg by a 9mm hollow-point bullet, which mushroomed and caused massive internal damage.

100.    On April 15, 2020, Yakima Washington Police Officer Nathan Henyan was injured when his P320 unintentionally discharged from within its holster without him pulling the trigger.

101.    On June 19, 2020, Army veteran George Abrahams was injured when his P320 unintentionally discharged without him pulling the trigger.

102.    At the time of Mr. Abrahams's incident, his P320 was contained within the holster which came in the box with his gun, which he was keeping in his pants pocket, which was fully zippered.

103.    On July 14, 2020, Milwaukee Police officer Adam Maritato was injured when his partner's duty-issued P320 unintentionally discharged from within its holster while the two were attempting to detain a suspect.

104.    On July 27, 2020, ICE Agent Joseph Halase was injured when his P320 unintentionally discharged while he was holstering the weapon.

105.    In 2020, a Wyoming Highway Patrol officer experienced an unintentional discharge, leading the Wyoming Highway Patrol to abandon the P320 as its standard duty weapon.

106.     On September 21, 2020, a P320 unintentionally fired while in the possession of Deportation Officer Keith Slatowski, of Immigration and Customs Enforcement during a training exercise in New Castle, Delaware.

107.     Slatowski's P320 fired while in its holster, and the casing did not eject.

108.     Slatowski was severely wounded and has not been able to return to duty since the incident, as of the date of this filing.

109.     On November 9, 2020, Tampa Police Officer Jerry Wyche was injured when his holstered P320 unintentionally discharged as he was exiting his police vehicle.

110.     On December 8, 2020, ICE Agent Catherine Chargualaf was injured when her P320 unintentionally discharged from within its holster during a training exercise.

111.     On January 23, 2021, civilian Timothy Davis was injured when his P320 X-Carry unintentionally discharged in its holster.

112.     On April 1, 2021, ICE Agent Fernando Armendariz was injured when his duty-issued P320 unintentionally discharged while he was in the process of holstering the pistol.

113.     On May 12, 2021, Department of Homeland Security Agent Amy Hendel was injured when her P320 unintentionally discharged during a training exercise.

114.     On June 2, 2021, Troy, New York Police Officer Michael Colwell suffered permanent injuries when his P320 unintentionally discharged in his holster during a training exercise, and while his hands were not touching the gun.

115.     On June 15, 2021, Massachusetts resident Kyle Ellis was injured when her P320 unintentionally discharged while it was in its holster.

116.     On August 18, 2021, Richmond County Georgia Sheriff's Deputy James Garth was injured when his P320 unintentionally discharged while he was holstering the weapon.

117.    On November 2, 2021, Florida resident Michael Parker's was injured when his P320 unintentionally discharged while it was in its holster, and while he was removing the holstered P320 from his pocket.

118.    On November 29, 2021, Atlantic County Prosecutor's Office Detective James Scoppa suffered severe tinnitus when his holstered P320 unintentionally discharged while he was inside of his car.

119.    On December 5, 2021, ICE Agent Mary Doffeny suffered severe emotional harm when her duty-issued P320 unintentionally discharged from within a dedicated compartment in her purse.

120.    Ms. Doffeny's incident was caught on video, which shows the gun unintentionally discharging.

121.    On January 15, 2022, Connecticut resident Zachary Brown was injured when his P320 unintentionally discharged from within its holster while he was attempting to remove the holster from his pants.

122.    On February 7, 2022, Honesdale, Pennsylvania Police Officer Donald Thatcher's P320 unintentionally discharged from its holster while he was exiting his car.

123.    Officer Thatcher's incident was captured on video, which shows that Officer Thatcher's hands were not touching his holster at the time the P320 discharged.

124.    Following this incident, the Honesdale, Pennsylvania Police Department discontinued use of all P320s and sued Sig Sauer for a refund of the firearms.

125.    On February 12, 2022, former Navy Small Arms Instructor Dionicio Delgado was injured when his P320 unintentionally discharged from within its holster.

126.    On February 26, 2022, Texas resident Juan Duran was injured when his P320 unintentionally discharged while it was in his holster.

127.    On March 28, 2022, Houston, Texas Police Sergeant Marvin Reyes's P320 unintentionally discharged from its holster while he was entering his car.

128.    Sergeant Reyes's incident was captured on video, which shows that Sergeant Reyes's hands were not near his holster at the time the P320 discharged.

129.    On April 4, 2022, Georgia prosecutor Matthew Breedon was injured when his P320 unintentionally discharged while he was in the process of removing it from his holster.

130.    On May 25, 2022, former Georgia correctional officer and former Monticello Georgia police officer Dwight Jackson was injured when Mr. Jackson's holstered P320 unintentionally discharged.

131.    On September 10, 2022, a Milwaukee Police Officer's holstered P320 unintentionally discharged while the officer was attempting to detain a suspect.

132.    Following this incident, the third similar incident involving a Milwaukee Police Officer, the Milwaukee Police Association filed a lawsuit against the City of Milwaukee to have the gun removed from service.

133.    In response to other similar incidents (OSIs) of Milwaukee Police Officers injured by the P320, Milwaukee Police Chief Jeffrey Norman announced on October 31, 2022, that the Milwaukee Police Department would replace all P320s in its arsenal with one of Sig Sauer's competitor pistols, and discontinue use of the P320.

134.    On November 7, 2022, Oklahoma resident Willam Clegg was injured when his P320 unintentionally discharged from within its holster after making contact with a small wooden paddle.

135.     Between 2015-2022, there have been at least *nine* incidents where an Oklahoma Highway Patrol Officer had a P320 unintentionally discharge when officers did not pull the trigger.

136.     Internal documents from Immigration Customs Enforcement show that unintended discharges skyrocketed within the agency once it switched its primary weapon from a Glock to the P320.

137.     Sig Sauer is aware of other claims of unintended discharges involving the P320 beyond those identified above.

138.     To date, Sig Sauer has never issued a recall of the P320; though it has done so in the past for other of its products with far fewer sales.

## DAVID ALAN COLE'S INCIDENT

139.     At all times pertinent to this Complaint, David Alan Cole was a detective with the Somerset County Sheriff's Department in Maine.

140.     Prior to May 4, 2022, Mr. Cole was issued a P320 from the Somerset Sheriff's Department.

141.     Mr. Cole was issued the subject P320 as his service firearm and instructed to use the subject P320 when performing his duties as a detective for the Somerset Sheriff's Department.

142.     On May 4, 2022, in Sangerville, Maine, Mr. Cole was executing a search warrant, along with several other officers of the Somerset and Piscataquis County Sherriff's Departments. After the premises had been searched and secured, Mr. Cole was in the building, and planned to walk to his vehicle to retrieve some items.

143.     As Mr. Cole was walking in the building, his P320 was in its holster, attached to his belt, which was part of his uniform.

144.    At the time and place alleged above, Mr. Cole was holding his jacket in both of his hands.

145.    As Cole was walking, and in the presence of several witnesses described above, Cole heard a gunshot.  Immediately, he responded as if he and the departments were under attack by gunfire.  Seconds later, Mr. Cole realized he was struck by a bullet from his P320.

146.    At all times pertinent to this complaint, Mr. Cole's P320 was in its holster.

147.    When Mr. Cole's P320 unintentionally discharged, Mr. Cole's hands were not on the P320 and his finger was not on the trigger.

148.    The bullet that unintentionally discharged from the subject P320 struck Mr. Cole in his right upper thigh, exited through the same, penetrated his right calf and reached a terminus in Mr. Cole's right ankle (where the bullet remained until surgically removed).

149.    Mr. Cole was required to undergo emergency surgery on his right leg, followed by a second surgery two days later.

150.    Mr. Cole had to remain in the hospital for three days after undergoing these surgical procedures and as a result of the unintentional discharge.

## COUNT I
### NEGLIGENCE

151.    Plaintiffs re-adopt and re-allege all paragraphs of this pleading as if fully set forth herein.

152.    Upon the information discovered through research and document production in many other similar incidents ("OSIs"), the Sig Sauer P320 is an unreasonably dangerous pistol, subjecting its buyers and all users in the United States market to unreasonable risks of serious bodily injury and death, beyond the inherent risks of firearms when handled in conformance with safe-firearm practices and manufacturer's instructions.

21

153.    Mr. Cole trusted Sig Sauer to live up to its reputation as a designer and manufacturer of safe and reliable handguns.

154.    Mr. Cole trusted Sig Sauer to live up to its promise that the P320 "would not fire unless you want it to."

155.    Mr. Cole was lied to and misled by Sig Sauer, falling victim to the dangerously designed and manufactured P320.

156.    At all relevant times, Sig Sauer owed Mr. Cole the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from unintentionally discharging and firing without a its trigger being pulled—before distributing and selling the gun and placing it into the stream of commerce.

157.    At all relevant times, Sig Sauer owed Mr. Cole the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from unintentionally discharging and firing without its trigger being pulled before distributing and selling the gun and placing it into the stream of commerce.

158.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Mr. Cole, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

159.    Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

i.      By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded and unintended discharges;

ii.     By failing to use due care in designing the P320 failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

iii.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-intended or un-commanded discharges;

iv.    By failing to issue a mandatory recall of the P320 as SIG SAUER had done in the past with other defective products;

v.     By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to unintentionally discharge un-commanded as described above;

vi.    By negligently failing to unambiguously warn purchasers and end users of the gun, including Mr. Cole, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, which it knew or should have known through the exercise of ordinary care;

vii.   By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to unintentionally discharge while in the possession of SIG SAUER, and during which times employees, servants or agents of SIG SAUER had an opportunity to inspect, service and work on the gun;

viii.  By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of unintentional discharges;

ix.    By including a defective and improper holster in the original packaging with the gun;

    x.      By misrepresenting the dangers and hazards posed by the gun;

    xi.     By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

    xii.    By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

    xiii.   By failing to incorporate safety mechanisms, which were standard among all of the P320s competitors;

    xiv.   Failing to ensure the P320 would not discharge when dropped from a reasonable height;

    xv.    Other negligent acts and omissions to be developed in the course of discovery.

160.    Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

161.    The gun's defective condition was not visible, and Mr. Cole was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

162.    If Sig Sauer had taken reasonable steps to manufacture, test, and warn, all as alleged above, Mr. Cole and others would have taken steps to avoid buying, owning, maintaining, using, carrying, and relying on any and all P320's in service of their duties, and therefore been able to prevent the injuries claimed in this Complaint.

163.    Sig Sauer's negligence, as alleged in this count, directly and proximately caused the May 4, 2022, unintended discharge and Mr. Cole's injuries resulting from the incident.

164.    As a direct and proximate result of the negligence set forth in this Count, Mr. Cole suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the

enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment. These injuries are either permanent or continuing in their nature and Mr. Cole will suffer such losses and impairments in the future.

## COUNT II
### STRICT PRODUCTS LIABILITY - 14 M.R.S. § 221

165. Plaintiffs re-adopt and re-allege all paragraphs of this pleading as if fully set forth herein.

166. Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under because:

   a. Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

   b. The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

   c. The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

   d. A feasible alternative design for the P320 existed, namely the inclusion an external safety that would prevent unintended trigger depression, such as a tabbed trigger, manual thumb safety, or grip safety;

   e. The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

167. The P320 was in a defective condition as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

168.    Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

169.    The defective condition of the P320 caused Plaintiff's injuries.

170.    Sig Sauer is therefore strictly liable to Plaintiff pursuant to Maine's Products Liability statute, 14 M.R.S. § 221 ("Defective or unreasonably dangerous goods").

171.    Specifically, Sig Sauer sold the P320 that caused Plaintiff David Cole's injuries in a defective condition unreasonably dangerous to Mr. Cole and is thereby subject to liability for the physical harm thereby caused to Mr. Cole—a consumer whom Sig Sauer might reasonably have expected to use, consume or be affected by the P320.

172.    Sig Sauer was, at all times relevant to the Complaint, engaged in the business of selling the P320 that was expected to and did so in fact reach Mr. Cole—the consumer—without significant change in the condition in which the subject P320 was sold.

173.    Sig Sauer is liable for Plaintiffs' damages under Maine law regardless of whether it exercised all possible care in the preparation and sale of the subject P320 and regardless of any contractual relation with the retailer.

## COUNT III
## FRAUDULENT CONCEALMENT

174.    Plaintiffs re-adopt and re-allege all paragraphs of this pleading as if fully set forth herein.

175.    Defendant had actual or constructive knowledge of material facts—including multiple design defects and OSI—which triggered a duty to disclose.

176.    Under Maine law, there existed a fiduciary relationship between Defendant and Plaintiffs.

177. Defendant failed to disclose to Plaintiffs any of the hazards of the dangerous and/or defective design and/or OSI of misfiring P320s of which it had actual and/or constructive knowledge.

178. The conduct of Defendant as alleged above was intentionally or recklessly done.

179. The Defendant intended to induce end consumers, including Plaintiffs, to act by supporting and consuming Defendant's products, including purchase and use of the P320.

180. Plaintiffs in fact relied upon Defendant's non-disclosure to their detriment.

181. As a result of Defendant's conduct as described above, Plaintiff suffered severe and permanent physical and emotional injury and damages.

182. Defendant's fraudulent concealment was a direct and foreseeable cause of Plaintiffs' damages, as alleged above.

## COUNT IV
## NEGLIGENT FAILURE TO WARN

183. Plaintiffs re-adopt and re-allege all paragraphs of this pleading as if fully set forth herein.

184. Defendant designed, tested, labeled, manufactured, tested, marketed, advertised, distributed, sold and/or issued warnings regarding the subject P320.

185. The subject P320 was in a defective condition and unreasonably dangerous because of a failure to provide adequate warnings regarding potential dangers involved in its use. This failure to provide adequate warnings included, but was not limited to, to the following:

   i. Defendants failed to properly warn, explain, and/or instruct foreseeable users of the subject P320 of the risk of unactuated and/or unintentional discharge;

   ii. Neither the signal words "Danger" nor "Warning" were included in the labeling on the marketing or owner materials for the subject P320;

   iii. Defendant failed to accurately label and warn users that the subject P320 was vulnerable to unactuated and/or unintentional discharge;

27

iv.    Defendants failed to adequately label and warn users that the subject P320 failed to meet safety standards based on its defective and/or dangerous design;

v.    Defendant failed to adequately inform users that the model P320 was susceptible to numerous reported incidents ("OSIs") in which users and/or others were seriously injured as a result of unactuated and/or unintentional discharge, even when the model P320 is properly holstered;

vi.    To the extent Defendant placed, gave, and/or made any warnings regarding the subject P320, the warnings were vague and not designed with adequate visual clarity, legibility, size, prominence, or statements of the hazards posed by the subject P320 so that a reasonably careful user would read the warnings and understand the risk of unactuated and/or unintentional discharge.

186.    Defendants manufactured, sold, or distributed the subject P320 in its defective and unreasonably dangerous condition.

187.    The subject P320 reached Plaintiff's employer, the Somerset County Sherriff's Department, and Plaintiff without a significant change in the condition in which it was manufactured, sold, or distributed by Defendant.

188.    The defective and unreasonably dangerous condition of the subject P320 was a proximate cause of Plaintiff's D. Cole's severe and permanent physical injuries, as well as other claimed damages of Plaintiffs D. Cole and K. Cole, respectively.

189.    At the time Plaintiff D. Cole was injured, Plaintiff D. Cole was using the subject P320 in a manner which was, could have been, and/or should have been reasonably foreseeable by Defendant.

## COUNT V
## DEFECTIVE DESIGN OR MANUFACTURE

190.    Plaintiffs re-adopt and re-allege all paragraphs of this pleading as if fully set forth herein.

191.    Defendant designed, tested, labeled, manufactured, tested, marketed, advertised, distributed, sold and/or issued warnings regarding the subject P320.

192.    The subject P320 was in a defective condition and unreasonably dangerous for reasons including, but not limited to, the following:

i.    It failed by discharging—unactuated and unintentionally—two rounds while secured in Plaintiff D. Cole's service holster;

ii.    On information and belief, Defendant failed to perform adequate safety testing on the subject P320;

iii.    The subject P320 failed to perform as safely as an ordinary user would expect, because discharged on an unactuated and unintentional basis;

iv.    The risks associated with the subject P320 as designed, tested, manufactured, labeled, marketed, advertised, distributed, and sold outweighed the benefits of the subject P320 because the risk of the discharging on an unactuated and/or unintentional basis during foreseeable use far outweighs the cost-saving benefits of the subject P320's design, or any benefit to the consumer from a firearm;

v.    A feasible alternative design existed in that Defendant had previously designed, manufactured, distributed and sold alternative firearms without the abnormally dangerous condition and/or defective design of the subject P320; and

vi.    A feasible alternative design existed in that while the subject P320 used an abnormally dangerous and/or defective design, alternative safer designs are available for use in comparable firearms at or near the same cost. For instance, Defendant itself sells numerous products that do not incorporate a "striker-fire" component.

193.    Defendant manufactured, sold, or distributed the subject P320 in its defective and unreasonably dangerous condition.

194.    The subject P320 reached Plaintiff's employer, the Somerset County Sheriff's Department, and Plaintiff without a significant change in the condition in which it was manufactured, sold, or distributed by Defendant.

195.    The subject P320 was not damaged, corroded, deformed, or altered in any way at the time of its failure, and was only subject to normal and expected use.

196.    The defective and unreasonably dangerous condition of the subject P320 was a proximate cause of Plaintiff's D. Cole's severe and permanent physical injuries, as well as other claimed damages of Plaintiffs D. Cole and K. Cole, respectively.

197.    At the time Plaintiff D. Cole was injured, Plaintiff D. Cole was using the subject P320 in a manner which was, could have been, and/or should have been reasonably foreseeable by Defendant.

## COUNT VI
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

198.    Plaintiffs re-adopt and re-allege all paragraphs of this pleading as if fully set forth herein.

199.    The subject P320 was in a defective condition at the time it was sold, or distributed by Defendant.

200.    This defective condition rendered the subject P320 not of fair average quality and not fit for the ordinary purposes for which comparable firearms are used.

201.    Defendant's breach of the implied warranty of merchantability was the proximate cause of Plaintiff's D. Cole's severe and permanent physical injuries, as well as other claimed damages of Plaintiffs D. Cole and K. Cole, respectively.

## COUNT VII
## LOSS OF CONSORTIUM

202.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint, the same as if fully set forth hereinafter.

203.    At all relevant times hereto, Plaintiff, Kimberly Cole was the spouse of plaintiff, David Cole, with whom she lives.

204.    As a result of the injuries sustained by Plaintiff, David Cole, wife-plaintiff Kimberly Cole, has been and will continue to be deprived of the levels and expectations of pre-incident love, assistance, companionship, consortium, and society of her husband, all to her loss and detriment.

## COUNT VIII
## PUNITIVE DAMGES

205.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint, the same as if fully set forth hereinafter.

206.    In the actions and omissions as set forth above, Defendant acted with actual or implied malice.

WHEREFORE, as a result of the above-described actions of Defendant, Plaintiffs have—either individually or together—suffered and continue to suffer severe and permanent physical injury, emotional distress, loss of consortium, economic loss, and loss of enjoyment of life. Plaintiff David Alan Cole is prevented and will continue to be prevented from performing daily activities and obtaining full enjoyment of life as a result of his permanent injuries. Plaintiffs have incurred and will continue to incur expenses for medical treatment and counseling.

WHEREFORE, Plaintiffs demand judgment against Defendant for compensatory damages, punitive damages, interest, costs, and such other and further relief as the Court deems just and equitable.

Respectfully submitted,

Dated:  July 21, 2023

Michael T. Bigos, Esq.
Maine Bar No. 9607
Berman & Simmons, P.A.
P.O. Box 961
Lewiston, ME  04243-0961
(207) 784-3576
Attorney for Plaintiffs
bigosservice@bermansimmons.com

Joseph G.E. Gousse, Esq.
Maine Bar No. 5601
Berman & Simmons, P.A.
P.O. Box 961
Lewiston, ME  04243-0961
(207) 784-3576
Attorney for Plaintiffs
bigosservice@bermansimmons.com

- and -

Dated:  July 21, 2023

/s/ Robert Mongeluzzi
Robert Mongeluzzi, Esq.
One Liberty Place, 52nd Fl.
1650 Market Street
Philadelphia, PA 19103
rmongeluzzi@smbb.com
(215) 496-8282
Attorney for Plaintiffs
(pending admission *pro hac vice*)

/s/ Larry Bendesky
Larry Bendesky, Esq.
Saltz, Mongeluzzi & Bendesky, P.C.
One Liberty Place, 52nd Fl.
1650 Market Street
Philadelphia, PA 19103
lbendesky@smbb.com
(215) 496-8282
Attorney for Plaintiffs
(pending admission *pro hac vice*)

/s/ Robert W. Zimmerman
Robert W. Zimmerman, Esq.
Saltz, Mongeluzzi & Bendesky, P.C.
One Liberty Place, 52nd Fl.
1650 Market Street
Philadelphia, PA 19103
rzimmerman@smbb.com
(215) 496-8282
Attorney for Plaintiffs
(pending admission *pro hac vice*)